IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2020

**JAMES JAYLEN SIMMONS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-D-2881     Mark Fishburn, Judge**

———————————————————

**No. M2019-00823-CCA-R3-PC**

———————————————————

The Petitioner, James Jaylen Simmons, pleaded guilty to second degree murder with an agreed sentence of forty years. The Petitioner timely filed a post-conviction petition, alleging that his attorney was ineffective, rendering his guilty plea unknowing and involuntary. After a hearing, the post-conviction court denied relief. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Timothy Carter (on appeal), and Jessica Van Dyke (at hearing), Nashville, Tennessee, for the appellant, James Jaylen Simmons.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Davidson County grand jury indicted the Petitioner and two co-defendants for first degree premeditated murder, first degree felony murder, and especially aggravated robbery of the victim, Luis A. Diaz. On March 2, 2017, the Petitioner pleaded guilty to the reduced charge of second degree murder with an agreed sentence of forty years[1] in

---

[1] The Petitioner qualified as a Range I offender, but based upon the plea agreement, he chose to plead guilty as a Range II offender pursuant to *Hicks v. State*, 983 S.W.2d 240 (Tenn. Crim. App. 1998).

the Tennessee Department of Correction and the remaining charges were dismissed. At the guilty plea hearing, the State offered the following summary of the evidence:

> [I]f this case had gone to trial, the State's proof would have been that Mr. Joshua Smith, who is the codefendant of [the Petitioner, and the Petitioner], . . . met in 2015. They were friends and they also sold drugs together. Joshua Smith worked at the Sonic on Murfreesboro Road where he met the victim, Luis Diaz. Smith began purchasing drugs from Luis Diaz and he and [the Petitioner] then sold those drugs.
>
> At some point prior to July 7th of 2015, [the Petitioner] and Joshua Smith began discussing a plan to rob Luis Diaz. Joshua Smith purchased a 9-millimeter firearm and gave it to [the Petitioner] at some point prior to that July 7th date.
>
> On July 7th of 2015, Joshua Smith had a court date in Murfreesboro, Tennessee. [The Petitioner] and the other codefendant, Jamal Young, picked Joshua Smith up from court in Murfreesboro. Smith then began texting with Luis Diaz about meeting Diaz after Mr. Diaz got off work at the Sonic that day so that they could purchase marijuana and cocaine from him. The three men [the Petitioner], Smith and Young, drove to the Compton's Market in a black Kia where Joshua Smith had arranged for him and [the Petitioner] to meet with Luis Diaz. Mr. Diaz pulled up to that Compton's Market in his gold Hummer vehicle, at that point, Mr. Diaz, Mr. Smith and [the Petitioner] all went into the Compton's Market and Mr. Diaz bought Joshua Smith a Monster drink. The three men then exited the market, Mr. Diaz got into the driver's seat of his Hummer, Joshua Smith got into the front passenger's seat, and [the Petitioner] got into the back seat behind Mr. Diaz, they then drove to Mr. Smith's apartment, which was on Anderson R[o]ad where they were going to complete the planned drug transaction.
>
> As soon as Mr. Luis Diaz put his vehicle in park, [the Petitioner] reached over from the back seat and shot Luis Diaz in the neck twice. [The Petitioner] then pulled Luis Diaz into the back seat of his car and shot Luis Diaz a third time. Simmons then got into the driver's seat of the victim's gold Hummer and began driving. He called Jamal Young, and he drove the victim's car to a car wash on Almaville Road and pulled into an automatic wash bay. While the Hummer vehicle was going through the car wash, [the Petitioner] began to take wads of cash out of Mr. Diaz's pockets. He took the victim's wallet, which included his passport. [The Petitioner] and Mr. Smith also took a pound of marijuana and four ounces of cocaine. They put

several of these items in a lunchbox type cooler.] [A]fterwards when they split the proceeds, [the Petitioner] received $1100 of the victim's money, as well as a half a pound of weed and an ounce of cocaine. Once the car finished going through the car wash, Mr. Joshua Smith exited the Hummer vehicle. He got the keys to the black Kia that Jamal Young had driven to the car wash to meet them and Smith left in that black Kia. Mr. Joshua Smith then went home, changed his clothes and went to the Sonic to work his shift. [The Petitioner] and Jamal Young left the car wash in Mr. Diaz's Hummer and drove to Rutherford County to a property off Highway 99 to dispose of his body. Mr. Jamal Young could not stomach assisting [the Petitioner] with removing Luis Diaz's dead body from the Hummer, so [the Petitioner] pulled Mr. Diaz out of the car onto the ground himself. He picked Mr. Diaz' body up under his arms and dragged him to an area behind an abandoned house where he left Luis Diaz's body facedown.

Later, detectives with the Metro Nashville Police Department did locate the remanence [sic] of Mr. Diaz's body on July 15th. His body was severely decomposed, but they could tell that Mr. Diaz was left facedown as [the Petitioner] described to them later in an interview. After leaving Mr. Diaz's body, [the Petitioner] and Mr. Young then drove to a Dollar Store on Highway 99 and bought cleaning supplies. They then drove to the Publix parking lot and cleaned the Hummer vehicle as much as they could. [The Petitioner] left the Hummer near his uncle's house in Murfreesboro overnight. [The Petitioner] and Mr. Young then decided to take the Hummer to a chop shop in Kentucky; however, Luis Diaz's uncle, Julio Hernandez, reported his nephew missing on July 8th because his nephew had not been seen since he left the Sonic the previous day. Luis Diaz did not show up for his second job, which was a night job cleaning buildings. [The Petitioner] then spoke to Fanesha (phonetic) Thompson and recruited her to ride with him in Luis Diaz's Hummer as they drove it to a chop shop in Kentucky where the plan was to have the vehicle painted and they would pick it up several days later and keep the Hummer.

Mr. Jamal Young followed [the Petitioner] and Ms. Thompson to Kentucky and then drove them back to Nashville. [The Petitioner] spoke to Detective Rowland and Detective Arendall of the Metro Nashville Police Department on July 17th of 2015 and during the interview [the Petitioner] told the detective most of the details . . . already stated on the record.

The Petitioner confirmed that he agreed that the facts summarized by the State were "true and correct."

The Petitioner timely filed a petition for post-conviction relief on February 6, 2018, alleging ineffective assistance of counsel. As relevant to his issues on appeal, the Petitioner asserted that his attorney's ("Counsel") "inaccurate" and "unlikely" advice that the Petitioner "might be eligible for a sentencing reduction at a later date and time" induced the Petitioner into pleading guilty. He also asserted that Counsel failed to investigate his case and locate favorable witnesses and that he failed to prepare for cross-examination of the co-defendants at trial.

At the post-conviction hearing, the parties presented the following evidence: The Petitioner's mother, Hattie Simmons testified that she attended the Petitioner's guilty plea hearing. She recalled meeting with Counsel after the hearing. About the meeting she stated:

> We had several questions after the plea, and that was one of our questions, if he could possibly go and ask for a sentence reduction and we were told that he could, you know, that he could file motions. [Counsel] made it clear that, after his plea, that his portion of it was done, of dealing with the case was done, but he did say that we could file motions or [the Petitioner] rather could file motions to get a sentence reduction.

Counsel testified that, at the time he was appointed in December 2016, the Petitioner's trial was set for the end of March. Counsel recalled that a "big issue" for the Petitioner was that he claimed that his co-defendant, Mr. Smith, shot the victim while Mr. Smith claimed the Petitioner shot the victim. Counsel said that after speaking with the State, he concluded that whether the Petitioner actually pulled the trigger on the gun was not significant in light of the evidence that would support a conviction for felony murder based upon the robbery. The only difference between the Petitioner's account of the events and the State's theory of the case was the identity of the shooter.

Counsel testified that he was aware that Quadricus Grey, a person the Petitioner had identified as a potential witness, was an inmate housed with Mr. Smith at some point. Mr. Grey wrote a letter stating that Mr. Smith, "had bragged about killing [the victim] or had spoken about killing him and that it was [the Petitioner]." Counsel contacted Mr. Grey's attorney, and the attorney consented to Counsel's giving the letter to the State but informed Counsel that Mr. Grey would not be willing to speak with him or testify. Counsel provided the letter to the State, and the State declined to alter its offer for settlement because both Mr. Smith and the Petitioner were criminally responsible for the victim's death regardless of who fired the gun. Nonetheless, Counsel still attempted to negotiate a settlement with the State.

Counsel confirmed that the Petitioner was serving a probation sentence at the time he committed the offense. Counsel recalled that the Petitioner initially rejected the State's offer to settle the case if the Petitioner pleaded guilty to second degree murder with a forty-year sentence at 100%. Counsel met with the Petitioner in jail several days before the guilty plea hearing. Counsel first reviewed the guilty plea with the Petitioner and then arranged for a phone call with the Petitioner's family so that the Petitioner could discuss the possibility of a guilty plea with them. Counsel described the Petitioner as "on the fence" about entering a guilty plea. Counsel left the room to allow the Petitioner a private discussion with his family. Later the same day, Counsel again spoke with the Petitioner about pleading guilty, and the Petitioner told Counsel to pursue a plea agreement with the State. Counsel recalled that the Petitioner appeared "comfortable" with the idea of pleading guilty. Counsel said that he negotiated with the State until the morning of the plea.

Counsel testified that he did not recall discussing sentencing reduction with the Petitioner. He stated that, based upon his interactions with the Petitioner's mother, he had no reason to believe her testimony was dishonest but that her testimony about sentence reduction sounded "unusual just because [he] knew the finality of a plea." He confirmed that he spoke with the Petitioner about post-conviction relief but was unsure whether he discussed possible habeas corpus relief.

On cross-examination, Counsel agreed that there was "a plethora of evidence" against the Petitioner in this case including: surveillance video, phone records, GPS data, witness accounts, and possession of the victim's belongings. Counsel recalled that the police spoke with Tanisha Mance's father. Tanisha Mance was the Petitioner's girlfriend, and the Petitioner sought advice from Mr. Mance because Mr. Mance had "been through the system." Mr. Mance reported to the police that the Petitioner had disclosed that a "Hispanic guy pulled a gun on" Mr. Smith, so the Petitioner shot the "Hispanic guy." Counsel agreed that the autopsy results confirmed that the victim was shot in the head. Counsel agreed that Mr. Smith's account of how the victim was shot was more consistent with the medical findings than the Petitioner's account.

Counsel testified that on the day of the guilty plea hearing the Petitioner said that he did not want to plead guilty. Counsel, recognizing that the decision to plead guilty was "big," was not "complete[ly] shock[ed]" by the Petitioner's statement. Counsel said that he reviewed the proof in the case with the Petitioner and the likely outcome at trial. He expressed concern about the Petitioner's police interview and how that could affect the outcome at trial. He also discussed with the Petitioner the benefits of the State's offer to settle the case. Counsel also spoke with the Petitioner's family and conveyed to them that the Petitioner wanted to proceed to trial, and he recalled that the Petitioner's family had "a negative reaction to it." Family members wrote a note to the Petitioner

encouraging him to plead guilty. Counsel gave the note to the Petitioner, and, after considering the note from his family, the Petitioner agreed to plead guilty.

The State asked Counsel about the Petitioner's allegation that he failed to investigate and prepare for impeachment of the co-defendants had they testified at trial. Counsel said that he never believed that Mr. Smith was going to testify at trial but that he was "familiar" with Mr. Smith's statement and his cell phone communication. Counsel did think there was a strong chance that Mr. Young would testify at trial based upon communication with Mr. Young's attorney. Counsel reviewed Mr. Young's statement to the police and identified self-serving statements or statements he could potentially use to discredit Mr. Young's testimony.

The Petitioner testified that he was twenty-one years old at the time of the guilty plea hearing. The Petitioner agreed that Counsel talked with him about the charges and evidence against him and the State's offer for settlement. The Petitioner confirmed that he was "very adamant" from the beginning that he was not the shooter. He further affirmed Counsel's testimony about their meetings leading up to the guilty plea hearing. He clarified, however, that he "did not make up [his] mind until the day of [the guilty plea hearing]." He stated that he remained uncertain about whether to plead guilty after Counsel met with him at the jail, and he did not fully decide to plead guilty until the day of the guilty plea hearing.

The Petitioner testified that he told Counsel that he would rather "take [his] chances at trial." He explained that there was not much difference between a life sentence and forty years. Further he did not understand what it meant to plead "out-of-range." The Petitioner said that he asked Counsel about his sentencing range and confirmed that he also asked the trial court about the sentencing range during the plea colloquy. The Petitioner recalled that, after he signed a rejection of the State's offer, Counsel took the rejection to the State's attorney. An hour later, Counsel returned with a letter from the Petitioner's family. The Petitioner said that Counsel told him that the State's offer was "the better option." The Petitioner also recalled Counsel telling him that the Petitioner "could file a habeas corpus and, when [the Petitioner] asked what that was, [Counsel] told [the Petitioner] that it was a motion . . . for a sentence reduction." The Petitioner said that it was this conversation that "swayed" him to accept the State's offer. Based upon this advice, the Petitioner believed he "would be able to get out sooner."

The Petitioner testified that he asked Counsel to interview Quadricus Grey, C.J. Sanders, and Tiara Coleman. The latter two were mutual friends of the Petitioner's and Mr. Smith's from school or work. The Petitioner asserted that these witnesses would "discredit a lot of things that [Mr. Smith] said because [these witnesses] were both [the

Petitioner's] and [Mr. Smith's] friends." The Petitioner believed that because C.J. Sanders and Tiara Coleman knew both men, these witnesses "would be credible."

On cross-examination, the Petitioner testified that the letter from his family on the day of the guilty plea hearing stated that he should consider the State's offer but that it was his choice. He denied that his family wrote that it was a bad decision to pursue a trial. The Petitioner stated that he did not recall the trial court reviewing his potential sentences during the guilty plea hearing. After refreshing his memory with the transcript, he recalled that the trial court did review his potential sentences were he to pursue a trial. He agreed that he wanted Counsel to speak with C.J. Sanders and Tiara Coleman before he realized that Mr. Smith would not be testifying for the State.

Upon questioning by the post-conviction court, the Petitioner testified that the theory of criminal responsibility was never discussed with him.

After hearing this evidence, the post-conviction court took the matter under advisement and issued a subsequent order denying post-conviction relief. The order included the following findings of fact:

1. [C]ounsel was the third attorney to represent Petitioner and the second in Criminal Court.

2. [C]ounsel was provided extensive discovery by the previous attorney who had already given a copy to Petitioner.

3. Prior counsel had a private investigator who had met once with Petitioner. [C]ounsel did not avail himself of his services and the investigator did not meet again with Petitioner.

4. [C]ounsel provided Petitioner with the photographs taken during the investigation, but not the phone records.

5. [C]ounsel reviewed the discovery with Petitioner on his laptop since most of it was on a thumb drive.

6. [Counsel] discussed his case with Petitioner's family. Family members were at the courthouse on the day Petitioner pled guilty.

7. Petitioner was on probation in Rutherford County at the time of this homicide and when he was interviewed by police.

8. Despite giving several conflicting stories about this crime to the police, Petitioner maintained he was not the one who shot and killed the victim.

9. Petitioner maintained that his co-defendant Mr. Smith was the shooter.

10. Mr. Smith maintained that Petitioner was the shooter.

11. Co-defendant Young and a Mr. Nance supposedly named Petitioner as the shooter.

12. [C]ounsel received a letter in the mail from an inmate who said co-defendant Smith was the shooter not Petitioner.

13. [C]ounsel attempted to speak to this person but was denied access to this person by his attorney.

14. There was no physical or other circumstantial evidence that was of any assistance indentifying who actually shot the victim.

15. The plea offer was always 40 years to serve. It was conveyed to [the Petitioner] by [C]ounsel and his previous attorney well before his trial date.

16. Petitioner met with [Counsel] in the court holding cell twice on February 28, 2017, with the expectation that he was going to enter a guilty plea.

17. Petitioner originally agreed to plead guilty but then withdrew it and the case was left for trial on March 2.

18. [C]ounsel presented Petitioner with a written rejection letter on March 2, 2017, which he signed.

19. [C]ounsel then spoke to Petitioner's family who wrote a note to Petitioner suggesting he reconsider pleading guilty, but indicating they would support whatever decision he made.

20. [C]ounsel presented the note to Petitioner and additional conversations about entering a plea occurred.

21. A condition of the plea agreement was that Petitioner admit he was the shooter.

22. Against his staunch desire to maintain that he was not the shooter, Petitioner pleaded guilty admitting he was the shooter.

23. [Counsel] said he has no memory of and said it would have been unusual to discuss any motion to reduce Petitioner's sentence that could have been filed post-plea.

24. [Counsel] did discuss the availability of Post-Conviction Relief with Petitioner's grandparents and possibly with Petitioner and his mother.

25. [C]ounsel did discuss with Petitioner and his mother post-sentence good and honor time reductions to emphasize the difference in Petitioner's quality of life between the plea offer and a life sentence.

26. There was incriminating evidence in this case that included Petitioner's statements to police.

27. [Counsel] reviewed the co-defendant's statements in this case in preparation to conduct cross-examination in the event that either testified at trial.

It is from this judgment denying relief that the Petitioner appeals.

**II. Analysis**

On appeal, the Petitioner maintains that Counsel was ineffective because Counsel: (1) advised him that he could file a motion to reduce his sentence; (2) failed to investigate and locate favorable witnesses; and (3) failed to prepare for cross-examination of the co-defendants should they testify at trial. The State responds that the Petitioner has failed to carry his burden of proof with regard to his allegations; therefore, the post-conviction court properly denied relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156

(Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."

Strickland, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea, as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that there "is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (footnote omitted); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

### A. Motion to Reduce Sentence

The Petitioner asserts that Counsel was ineffective for failing to advise him that he was not eligible for a sentence reduction. In the order denying relief, the post-conviction court made the following findings:

> Petitioner alleges he would not have taken the plea if he had known he was not eligible to file for a sentence reduction at a later date. At the hearing, he further alleged he did not understand why he had pled to a Range II sentence when he was a Range I offender. Despite Petitioner's allegations, the transcript of the guilty plea shows reflects Petitioner made

- 11 -

specific inquiry into his *Hicks* and a discussion with the court ensued, culminating in Petitioner stating he had no more questions about that issue. During this discussion, the court informed Petitioner he would be pleading to "40 years at 100 percent on several different occasions." There was no discussion of any sort regarding his eligibility for a future reduction in sentence and Petitioner did not make any inquiry into the matter. Later in the plea colloquy the court asked Petitioner if he understood that the court's acceptance of his guilty plea would end his case once and for all to which Petitioner responded in the affirmative. Further, Petitioner's attorney has testified that he had no memory of discussing any sort of motion to reduce Petitioner's sentence after his judgment became final. The only reference on this issue was the good and honor time credit that Petitioner could earn to reduce his sentence up to fifteen percent. The court finds that Petitioner was fully informed of the nature and consequences of his plea.

The evidence supports the post-conviction court's denial of relief. The transcript of the guilty plea hearing shows that the Petitioner inquired about his range of sentence, and the trial court explained why the Petitioner was to be sentenced as a Range II offender rather than a Range I offender. The trial court clearly reviewed the Petitioner's rights with him and his sentence. The Petitioner acknowledged the finality of a plea and entered a plea of guilty. A petitioner's testimony at a guilty plea hearing "constitute[s] a formidable barrier" in any subsequent collateral proceeding because "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Moreover, Counsel testified that he did not recall discussing a motion to reduce the Petitioner's sentence with him and that he thought that such a discussion would be "unusual" given his understanding of the finality of a plea.

Accordingly, we conclude that the Petitioner has failed to show that Counsel was ineffective in this respect or that but for Counsel's alleged erroneous advice, that the Petitioner would not have accepted the State's offer to plead to a lesser-included offense with dismissal of his remaining charges. The Petitioner is not entitled to relief.

### B. Potential Witnesses

Next, the Petitioner contends that Counsel was ineffective because he failed to investigate and locate Quadricus Grey. The State responds that the Petitioner failed to prove prejudice because he did not offer Quadricus Grey as a witness at the post-conviction hearing. We agree with the State.

This court has stated:

When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel. The same is true regarding the failure to call a known witness. In short, if a petitioner is able to establish that defense counsel was deficient in the investigation of the facts or calling a known witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland v. Washington*.

*Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990).

The post-conviction court found that the Petitioner had failed to present Mr. Grey as a witness at the post-conviction hearing and that it was not within its authority to speculate as to Mr. Grey's possible testimony. The post-conviction court also found that Counsel had testified that he attempted to speak with Mr. Grey but "was prevented access to [Mr. Grey] by [Mr. Grey's] attorney." The post-conviction court also considered the unlikelihood that the Petitioner could have secured a better deal in light of the legal theory of criminal responsibility.

Here, the evidence does not preponderate against the findings of the trial court. Petitioner has failed to establish any deficiency by trial counsel. Furthermore, the Petitioner has failed to establish prejudice since Mr. Grey was not called as a witness in the post-conviction hearing. *Id.* at 757. Accordingly, the Petitioner is not entitled to relief as to his issue.

### C. Impeachment

- 13 -

In his final allegation regarding Counsel's representation, the Petitioner asserts that Counsel failed to prepare for cross-examination of the co-defendants had they testified at trial. In the order denying relief, the post-conviction court made the following findings:

> At the hearing, [C]ounsel clearly testified that he had thoroughly read the statements the co-defendants gave to the police. He also testified that he was of the opinion that Joshua Smith would not be used as a State's witness, but that Xavier Young would be testifying because he most likely would be more difficult to impeach. Counsel clearly had been planning and strategizing as to how to handle the possible testimony of these co-defendants. Petitioner has presented no evidence that counsel was unprepared or ineffective in this area.

The evidence does not preponderate against the post-conviction court's findings of fact. Counsel testified at the post-conviction hearing that he did not believe that Mr. Smith would be testifying but that he still familiarized himself with Mr. Smith's statement to the police and Mr. Smith's cell phone communication around the time of the murder. Counsel had reason to believe that Mr. Young would testify and prepared for cross-examination by reviewing Mr. Young's statement to the police and identifying potential statements he could use for impeachment purposes. Counsel's testimony reflects well-informed decisions as he prepared for trial.

Accordingly, we conclude that the Petitioner has failed to prove this allegation and has not shown how Counsel's preparation for cross-examination prejudiced the Petitioner. The Petitioner is not entitled to relief.

### III. Conclusion

After review, we conclude that the post-conviction court did not err when it denied the Petitioner post-conviction relief. Accordingly, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE